ACCEPTED
06-14-00046-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
1/23/2015 2:22:43 PM
DEBBIE AUTREY
CLERK

# IN THE COURT OF APPEALS
## SIXTH APPELLATE DISTRICT OF TEXAS
## AT TEXARKANA

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
1/23/2015 2:22:43 PM
DEBBIE AUTREY
Clerk

### NOS:    06-14-00046-CR & 06-14-00047-CR

### LEAVELLE FRANKLIN, APPELLANT

### VS.

### THE STATE OF TEXAS, APPELLEE

### Appeal from the 102nd District Court of Bowie County, Texas

### BRIEF ON BEHALF OF THE APPELLANT, LEAVELLE FRANKLIN

Jason Horton
jason@jasonhortonlaw.com
Texas Bar No.: 24041130

JASON HORTON LAW FIRM
114 West Broad Street
Texarkana, Texas 75501
*Mail To:*
Post Office Box 1596
Texarkana, Texas  75504
T-903-792-2000
F-903-792-2100
www.jasonhortonlaw.com

ATTORNEY FOR APPELLANT

APPELLANT REQUESTS ORAL ARGUMENT

## IDENTITY OF THE PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, the undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made so that the Justices of this Honorable Court can evaluate whether they are disqualified to serve or should recuse themselves from participation in the decision of this case.

**Trial Court Judge:**
102nd Judicial District Court Judge Honorable Bobby Lockhart

**Defendant/Appellant:**
Leavelle Franklin

**Attorneys for Defendant/Appellant at Trial:**
William Williams
Texas Bar No. 24072804
Chad Crowell
Texas Bar No. 24072808
Bowie County Public Defender's Office
424 West Broad Street
Texarkana, Texas 75501

**Attorney for Defendant/Appellant on Appeal:**
Jason Horton
Texas Bar No. 24041130
JASON HORTON LAW FIRM
P.O. Box 1596
Texarkana, Texas 75504

**Attorneys for the State of Texas/Appellee at Trial and on Appeal:**
Bowie County Assistant District Attorney Samantha Oglesby
Texas Bar No. 24070362
Bowie County Assistant District Attorney Kelley Crisp
Texas Bar No. 24062683
601 Main Street
Texarkana, Texas 75501

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ..................................................2

TABLE OF CONTENTS ...........................................................................3

INDEX OF AUTHORITIES .......................................................................5

STATEMENT OF THE CASE .....................................................................7

ISSUES PRESENTED ..............................................................................8

## ISSUE I.

The trial court erred by permitting the introduction of Sexual Assault Nurse Examiner Kathy Lach's reports because Lach did not inform the alleged victims that a proper diagnosis depended on the veracity of their statements.

## ISSUE II.

The State's direct examination of forensic interviewer Melanie Hughes opened the door to cross-examination regarding the inconsistencies in the girls' claims of abuse without fear of the State offering extraneous offense evidence in rebuttal.

## ISSUE III.

After the "Rule" was invoked, the trial court erred by permitting Child Advocacy Clinical Director Karrah Dickeson to remain in the courtroom while the alleged victims testified.

## ISSUE IV.

During final closing argument, the State's instruction for the jury to "[g]o back there and fight for those little girls" was an improper plea for abandonment of objectivity, and the trial court erred by overruling Appellant's objection to the same.

STATEMENT OF FACTS................................................................9

SUMMARY OF THE ARGUMENT...........................................21

ARGUMENT ...............................................................................22

PRAYER ......................................................................................44

CERTIFICATE OF COMPLIANCE ..............................................45

CERTIFICATE OF SERVICE.........................................................45

# INDEX OF AUTHORITIES

**CASES**                                                     **Page**

*Alejandro v. State,* 493 S.W.2d 230
(Tex.Crim.App.1973)................................................................................41

*Barnes v. State,* 70 S.W.3d 294
(Tex.App.-Fort Worth 2002)....................................................................41

*Bass v. State*, 270 S.W.3d 557
(Tex.Crim.App. 2008)...............................................................................31

*Brandley v. State*, 691 S.W.2d 699
(Tex.Crim.App. 1985)...............................................................................42

*Cantu v. State*, 366 S.W.3d 771
(Tex.App.—Amarillo 2012)...............................................................32, 33

*Cofield v. State*, 891 S.W.2d 952
(Tex.Crim.App. 1994)...............................................................................23

*De La Paz v. State*, 279 S.W.3d 336
(Tex.Crim.App. 2009)...............................................................................31

*Felder v. State,* 848 S.W.2d 85
(Tex.Crim.App.1992).................................................................................41

*Green v. State*, 934 S.W.2d 92
(Tex.Crim.App. 1996)...............................................................................30

*Harris v. State*, 122 S.W.3d 871
(Tex.App.—Fort Worth 2003) ..................................................................41

*King v. State*, 953 S.W.2d 266
(Tex.Crim.App. 1997)...............................................................................28

*Lopez v. State*, 2014 WL 1267249 at *1
(Tex.App.—Amarillo 2014, pdr ref'd).....................................................26

*Martinez v. State,* 17 S.W.3d 677
(Tex.Crim.App.2000).................................................................................41

*Martinez v. State*, 178 S.W.3d 806
  (Tex.Crim.App. 2005) ...........................................................................23

*Montgomery v. State*, 810 S.W.2d 372
  (Tex.Crim.App. 1991) ......................................................................22, 23

*Moore v. State*, 882 S.W.2d 844
  (Tex.Crim.App. 1994) .................................................................38, 39, 40

*Mosley v. State,* 983 S.W.2d 249
  (Tex.Crim.App.1998) .............................................................................41

*Page v. State*, 213 S.W.3d 332
  (Tex.Crim.App. 2006) ............................................................................22

*Potier v. State,* 68 S.W.3d 657
  (Tex.Crim.App. 2002) ............................................................................37

*Sauceda v. State*, 129 S.W.3d 116
  (Tex.Crim.App. 2004) ............................................................................22

*Taylor v. State*, 268 S.W.3d 571
  (Tex.Crim.App. 2008) ...........................................................23, 24, 25, 27

*Wiley v. State,* 74 S.W.3d 399
  (Tex.Crim.App. 2002) ............................................................................37

## STATUTES and RULES

Texas Rule of Appellate Procedure 44.2(b) ...........................................28, 41

Texas Rule of Evidence 614 .................................................................39, 40

Texas Rule of Evidence 802 .....................................................................23

Texas Rule of Evidence 803 .........................................................23, 24, 25, 30

## STATEMENT OF THE CASE

The State joined two separate Indictments in a single proceeding and tried Appellant on six separate counts of Aggravated Sexual Assault of Child. Appellant was convicted and sentenced to LIFE in prison on each count. The trial court stacked each sentence within the Indictments but ran the Indictments concurrent with one another, for a total of three consecutive LIFE sentences.

On appeal, Appellant contends that the trial court committed reversible error by (1) permitting the introduction of the SANE reports; (2) concluding that the State did not open the door to cross-examination regarding the alleged victims' inconsistent claims of abuse; (3) permitting an expert to remain in the courtroom in violation of the "Rule;" and (4) overruling Appellant's objection to the State's improper plea for abandonment of objectivity during final closing argument. The following brief is filed in support of Appellant's contentions.

# ISSUES PRESENTED

## I.

The trial court erred by permitting the introduction of Sexual Assault Nurse Examiner Kathy Lach's reports because Lach did not inform the alleged victims that a proper diagnosis depended on the veracity of their statements.

## ISSUE II.

The State's direct examination of forensic interviewer Melanie Hughes opened the door to cross-examination regarding the inconsistencies in the girls' claims of abuse without fear of the State offering extraneous offense evidence in rebuttal.

## ISSUE III.

After the "Rule" was invoked, the trial court erred by permitting Child Advocacy Clinical Director Karrah Dickeson to remain in the courtroom while the alleged victims testified.

## ISSUE IV.

During final closing argument, the State's instruction for the jury to "[g]o back there and fight for those little girls" was an improper plea for abandonment of objectivity, and the trial court erred by overruling Appellant's objection to the same.

**STATEMENT OF FACTS**

Appellant is the biological father of alleged victims "Barbara" and "Tasha". (6 RR 91) "Barbara" and "Tasha" live with their mother, Conesha, and Conesha's boyfriend Bobby. (6 RR 90)

Appellant would occasionally get the girls on a weekend, usually on a holiday, so it didn't surprise Conesha when Appellant called and asked if he could have the girls on Easter weekend in 2013. (6 RR 92) According to Google, Easter Sunday was March 31, 2013. Upon their return from visiting Appellant, Conesha thought it was unusual that neither "Barbara" nor "Tasha" hugged her or Bobby when they came in the door. Conesha and Bobby also thought it was unusual that Appellant did not come in with the girls before he headed back home. (6 RR 81, 93) Later that night, Conesha went to check on the girls after she unexpectedly heard the upstairs bathroom door close. Conesha found "Tasha" asleep and "Barbara" in the bathroom. (6 RR 95) "Barbara" told Conesha that she wiped herself and saw some blood. (6 RR 95) Conesha had "Barbara" wipe herself again, but no blood was found. (6 RR 96) Conesha testified that she immediately thought "Barbara" had been molested. (6 RR 97) Conesha asked "Barbara" if she had been sexually abused, and "Barbara" shook her head no. Conesha claimed that "Barbara" appeared scared. (6 RR 97)

Conesha let it go, but at some point later in the week she told Bobby that she thought something was wrong with the girls. (6 RR 98-99) She asked Bobby to speak

with the girls, and Bobby told her he would speak with them after work the next day. (6 RR 99) Prior to speaking with Bobby, seven-year-old "Barbara" told Conesha that Appellant had been "molesting her." (6 RR 101) According to Conesha, "Barbara" said Appellant touched her between the legs, and, after speaking with Bobby, "Barbara" told Conesha that Appellant put his penis in her mouth. (6 RR 101, 102)

Bobby did not speak with the girls until the following Wednesday evening. (6 RR 82) According to Bobby, "Tasha" told him Appellant made her put her mouth on his penis, then Appellant got on top of her and started "hunching." Bobby defined "hunching" as having sex, and he also said "hunching" could be kids "screwing on each other" in the playground. (6 RR 83, 85) "Barbara" told Bobby that Appellant put his hand between her legs and was trying to put his finger inside her, and that Appellant put her on her back and got on top of her. That's when Appellant told "Barbara" that she was his new girlfriend. (6 RR 88) After hearing all of this, Bobby called the police. (6 RR 87)

Bowie County Sheriff's Deputy Cole Ogden responded to the call. (6 RR 112) Ogden did not collect any evidence because the abuse allegedly occurred somewhere else. (6 RR 113) Ogden testified that he did not speak with the girls, nor did he retrieve the girls' clothing. (6 RR 113, 116) Conesha told Ogden that she believed the blood "Barbara" described was from Appellant disciplining "Barbara". (6 RR 117) However, Ogden's offense report claimed that "victim one" came back and said

that her father touched her private part. (6 RR 117) According to Ogden, this is why he advised Conesha and Bobby to take the girls to the hospital. (6 RR 117) On redirect by the State, without any objection from Appellant's trial counsel and no additional evidence introduced in support, Ogden claimed it was his understanding that the girls had been "raped" by their father. (6 RR 118)

According to Record Exhibit 2, the girls were taken to the Texarkana Children's Advocacy Center (CAC) on April 4, 2013. During her CAC interview, "Tasha" claimed Appellant touched her private part while she was in the backseat of Appellant's car. Appellant was driving the car at the time. "Tasha" claimed this happened sixteen times. "Tasha" said her "Paw Paw" was in the front seat talking with Appellant when Appellant would reach in the back and touch her private parts. "Tasha's" clothes were on, and Appellant touched her on top of her clothes.

"Tasha" also said that Appellant touched her private parts on top of her clothes as they rode a motorcycle. As one hand touched her private parts, Appellant's other hand was in his lap, and all of this happened while the motorcycle was moving. "Tasha" said that Appellant only touched her two times and never touched her before that Friday. After identifying various body parts, "Tasha" said that Appellant touched her private parts on Sunday in the backseat of a car, and not on the motorcycle. "Tasha" unequivocally said that (1) no one had ever shown her videos or pictures of

naked people; (2) no one had ever touched her privacy under her clothes; and (3) no one had ever made her touch their privacy parts.

"Tasha" said that Appellant also reached back and put his hand in "Barbara's" privacy part while they were in the backseat of the car. The car was moving, and "Barbara's" shorts were on. "Tasha" said that she had blood on her privacy part because Appellant whooped her with a belt on her butt.

During "Tasha's" interview, CAC forensic interviewer Melanie Hughes left the room to discuss the case with the law enforcement officers who had been watching the entire time. Upon Hughes' return, "Tasha" again said that no one had ever made her touch a boy's or a man's privacy part, and that no one had ever shown her videos or pictures of people with no clothes on. *See* Record Exhibit 2.

Record Exhibit 2 also contains "Barbara's" April 4, 2013, CAC interview. "Barbara" thought she was there to talk about drawing and painting. "Barbara" said that Appellant touched her "lips" (part of her face) while at her "Paw Paw's" house, then "Barbara" said Appellant touched her lips at Gloria's house. "Barbara" said she was bleeding on her butt because she did not wipe herself. "Barbara" said that her daddy's man part touched her lips while they were at Gloria's house. Although "Barbara" referred to both Bobby and Appellant as her "daddy," it appears as though "Barbara" was referring to Appellant when discussing the incident with the man part.

"Barbara" said that she was in the living room when Appellant's man part touched her lips. When Melanie asked "Barbara" to tell her more, "Barbara" pointed to a drawing and said "his knees." "Barbara" said Appellant's man part went inside her lips and tasted like milk and felt like gum. "Barbara" drew what a man part looked like, then said Appellant put his man part in her middle part. "Barbara" said that she and Appellant were in Appellant's room because Gloria, Bobby and Appellant were fighting after Gloria and Bobby witnessed the alleged sexual abuse.

"Barbara" said Appellant flipped her over in the bed and put his man part in her middle part. At first "Barbara" said they were both clothed, but then she said Appellant took her clothes off and put them back on. Then "Barbara" said she went to the doctor because her butt was bleeding after Appellant whooped her with a belt. She said Appellant's man part felt soft, then changed the subject and said it was cold in the room. "Barbara" then said her clothes were on when Appellant's man part went in her middle part, and this only happened one time. Like "Tasha", "Barbara" said that no one had ever shown her videos of people without clothes on.

Just as she did during "Tasha's" interview, Hughes left the room to discuss "Barbara's" interview with law enforcement. When she returned and resumed questioning, "Barbara" said that nothing came out of Appellant's man part when it went in her middle part. However, chocolate milk came out when Appellant's man

part touched her lips, and the milk went in her mouth. It tasted like "white." She spit it in a towel and put the towel in the kitchen.

"Barbara" said blood came out of her middle part and went in her butt. She also said Appellant laid on her when she was on her stomach, and Appellant fell asleep on her at some point. This made "Barbara" feel hungry, and "Barbara" reached out and felt some Lucky Charms cereal when Appellant was laying on top of her. *See* Record Exhibit 2.

Fourteen days after the CAC interviews, and at the request of law enforcement, the girls were examined at the CAC by Sexual Assault Nurse Examiner Kathy Lach. (6 RR 148) Kathy Lach testifies for the State in almost every Bowie County sexual assault trial, commonly drawing objections from defense counsel for her "90%" testimony. Lach routinely testifies, as she did in this case, that physical trauma is not present in 90% of sexual assault victims. (6 RR 138) Prior to Lach's trial testimony, Appellant's trial counsel conducted a hearing outside of the jury's presence to obtain a ruling on whether Lach's routine "90%" testimony is reliable for purposes of providing an expert opinion on the same. (6 RR 16-36) Appellant did not object to Lach's qualifications. The objection was that Lach's "90%" testimony is based on "junk science." (6 RR 36) The trial court permitted the testimony, most likely because Lach testified that she had performed over 500 sexual assault examinations and documented no physical trauma in 90% of those examinations. (6 RR 27)

Because Lach testifies that her examinations are performed for "medical diagnosis or treatment," she is able to tell juries what alleged sexual assault victims tell her about their history of abuse over hearsay objections. (6 RR 123) Here, unlike "Barbara's" recorded CAC interview, Lach testified that "Barbara" told her Appellant assaulted her orally and anally, and that Appellant penetrated her vagina. (6 RR 133-135) According to Lach, "Barbara" said that "milk," and not chocolate milk, came out of Appellant's middle part when he put his middle part in her mouth. (6 RR 134) Unlike "Tasha's" recorded CAC interview, Lach testified that "Tasha" described oral, anal, and vaginal sexual assault, along with touching and digital penetration. (6 RR 136)

Lach's interviews with the girls were not recorded. Lach testified that her reports are based solely on what is relayed to her by the alleged victims, and her subsequent referrals for counseling are based solely on the history given by the alleged victims. (6 RR 153-154) Lach obtained no physical evidence from "Barbara" or "Tasha," and her examination showed no physical trauma on either child. (6 RR 137, 153) While she may have explained to "Barbara" and "Tasha" that she would be writing down everything they said verbatim and that the girls were there for medical diagnosis or treatment, Lach did not provide any testimony indicating she told either of the girls that a proper diagnosis depends on the veracity of their statements. (6 RR 125)

CAC forensic examiner Hughes testified that Texas law requires children to take an oath during their forensic interviews. (6 RR 195) Hughes testified in detail as to why children have a hard time testifying and remembering things, and that it is very common for children to have inconsistent stories. (6 RR 198-199) Hughes routinely compares police reports to her interviews and looks for "consistency" in core details. (6 RR 201) In this case, Hughes saw no signs of coaching, and "Barbara" and "Tasha" "appear[ed] to be testifying to something that they did, in fact, actually experience." (6 RR 203)

After this line of questioning, Appellant's trial counsel objected and moved for a ruling that the State opened the door for cross-examination regarding the inconsistencies in the girls' stories of abuse without fear of Appellant being attacked with extraneous offense witnesses the State had waiting to testify. The trial court denied Appellant's motion, indicating Hughes' testimony did not open any doors. (6 RR 206-212)

Hughes also testified that her interviews are monitored by law enforcement, and that the interviews are set-up so they are "legally defensible" in court. (6 RR 217-219)

Prior to "Tasha" taking the stand, the State requested that Karrah Dickeson, the CAC Clinical Director, remain in the courtroom while "Tasha" and "Barbara" testified because Dickeson was going to be an expert witness and she needed to observe the

girls' testimony. (6 RR 220-221) Appellant's trial counsel objected "until [he knew] the basis of why [Dickeson] needs to observe the testimony." (6 RR 221) Without requiring anything further from the State, the trial court overruled Appellant's objection. (6 RR 221)

After a series of leading questions, "Tasha" testified that (1) she saw Appellant's privacy when he sexually abused her; (2) Appellant touched his privacy to her privacy; (3) Appellant put his privacy in her mouth; (4) Appellant put his privacy in her rear end; (5) she saw Appellant sexually abuse "Barbara;" and (6) Appellant showed her videos of people hunching. (6 RR 225-229) Appellant's trial counsel played a portion of "Tasha's" recorded CAC interview outside of the jury's presence to refresh "Tasha's" recollection, but Appellant's trial counsel did not cross-examine "Tasha" regarding her inconsistent allegations of abuse in fear of opening the door to extraneous offense evidence. (6 RR 238-244)

"Barbara" began her trial testimony by not being able to distinguish her right hand from her left hand, and she was confused with the difference between the truth and a lie. (6 RR 246, 250) "Barbara" testified that Appellant put his hand on her private part, and "I think that's all." (6 RR 256) She didn't know if Appellant's middle part touched her middle part, but she answered "yes" when asked if Appellant's middle part went in her middle part. (6 RR 256) "Barbara" testified that Appellant's middle part went in her buttocks, and, while this was going on, the

television was playing nasty movies with people hunching. (6 RR 257-259) "Barbara" testified that "Tasha" did not see Appellant do these things because there was a curtain separating them. (6 RR 259)

According to "Barbara," Appellant had his underwear on when he put his penis in her mouth on Easter weekend. (6 RR 262) Milk came out of Appellant's middle part and it went in her mouth. "Barbara" said it tasted like plain milk. (6 RR 263-264) "Barbara" testified that she was bleeding between her legs because Appellant sexually abused her. (6 RR 265) Contrary to "Tasha's" CAC interview, "Barbara" testified that Appellant never touched her between her legs in the car. (6 RR 266) "Barbara" did say that Appellant told them they were his girlfriends as he abused them. (6 RR 268) According to "Barbara," Appellant asked "Barbara" if she liked the abuse and then spanked her when she said no. (6 RR 278)

Appellant's trial counsel played "Barbara's" recorded CAC interview outside of the jury's presence to refresh "Barbara's" recollection. (6 RR 273) Appellant's trial counsel cross-examined "Barbara" regarding several inconsistencies between the video and "Barbara's" trial testimony, but none of the cross-examination questions were related to the actual claims of abuse in fear of the State claiming the door was opened to extraneous offense evidence. (6 RR 275-277) Although given the opportunity, Appellant's trial counsel indicated he did not need to conduct a further proffer regarding the inconsistencies between the CAC interviews and the trial

testimony. (6 RR 282) The recorded CAC interviews were offered as Record Exhibit 2.

Karrah Dickeson, who was permitted to observe both "Barbara" and "Tasha" testify, told the jury that the girls did not know words like "sexual abuse" before going to counseling. (7 RR 16) Dickeson testified that these words help children express themselves because they need to know what they experienced. (7 RR 17) She claimed that the girls struggled with avoidance, and that the abuse was very difficult for them to talk about. (7 RR 20-21) Dickeson was then able to inform the jury as to why "Tasha" had a difficult time testifying based solely on Dickeson's observations of her testimony. (7 RR 21-22) The State then attempted to introduce "Barbara" and "Tasha's" statements for a fourth time through Dickeson, claiming the statements were made for medical diagnosis or treatment. (7 RR 22-24) Fortunately, the trial court sustained Appellant's objection and did not permit Dickeson to testify as to what the girls told her.

Appellant decided against testifying during the guilt/innocence phase. (7 RR 28) Immediately after Appellant informed the trial court of his decision, the State informed the trial court that there were six extraneous victims prepared to testify across the hall. (7 RR 30) The State reluctantly conceded that Appellant did not open the door to this evidence during trial. (7 RR 33)

During final closing argument, the State instructed the jury to "go back there and fight for those little girls." Appellant's trial counsel immediately objected in that it was improper for the State to instruct the jury to be an advocate for the State. The trial court overruled the objection. (7 RR 63-64)

During a recorded custodial interview, Appellant voluntarily waived his right to counsel and vehemently denied abusing his own daughters. (10 RR at Record Exhibit 1) A redacted version of this interview was played for the jury. (6 RR 174) During pretrial hearings, Appellant rejected all plea offers and said, "I don't care if they give me the death penalty, I didn't do it." (2 RR 5; 3 RR 11, 17-18) No DNA testing was performed on the girls, and law enforcement did not search the girls for hair samples. (6 RR 168) Lead Investigator Todd Aultman testified that no evidence was collected, and he didn't even attempt to look for the towel "Barbara" allegedly spit the "milk" into. (6 RR 179-180) Gloria Stokes, Appellant's stepsister, testified that she saw Appellant in a car on Easter weekend, but, because of the way Appellant pulled up and left, she couldn't tell if the girls were in Appellant's car or not. (7 RR 8) She later testified that no one was in the car with Appellant on Easter weekend. (7 RR 10)

Nonetheless, the jury found Appellant guilty on all six counts and sentenced him to LIFE in prison on each count. (7 RR 68; 9 RR 28-29)

## SUMMARY OF THE ARGUMENT

These cases are hard on everyone involved. Young children should never have to be marched into a courtroom and subjected to direct or cross-examination. Parents should not be forced to relive traumatic events over and over again. The State should not have to spend precious resources prosecuting these cases because sexual assaults should never occur. Nevertheless, when the State does choose to subject someone to prosecution, regardless of the charge, that person is entitled to a fair trial.

Prior to calling the alleged victims to the stand, the State called five witnesses to replay different versions of the alleged victims' stories; explain why the victims would have no injuries; explain why the alleged victims' stories might be inconsistent; explain why the alleged victims might have a hard time testifying; and simply bolster the alleged victims' credibility. In the process, the trial court (1) permitted the introduction of inadmissible hearsay; (2) prevented Appellant from effectively cross-examining the State's witnesses; (3) permitted an unsupported violation of the "Rule;" and (4) permitted improper closing argument that instructed the jury to be an advocate for the State and check their objectivity at the deliberation room door. Even though each of these errors supports a reversal of Appellant's convictions, the cumulative effect of these errors demands it.

# ARGUMENT

## ISSUE I

The trial court erred by permitting the introduction of Sexual Assault Nurse Examiner Kathy Lach's reports because Lach did not inform the alleged victims that a proper diagnosis depended on the veracity of their statements.

## STANDARD OF REVIEW

A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Page v. State*, 213 S.W.3d 332, 337 (Tex.Crim.App. 2006); *citing Sauceda v. State*, 129 S.W.3d 116, 120 (Tex.Crim.App. 2004). "If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." *Id.* A trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement." *Page*, 213 S.W.3d at 337; *citing Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1991)(op. on reh'g).

## PRESERVATION OF ERROR

Appellant's trial counsel objected to the introduction of the SANE reports as hearsay, also informing the trial court that the reports were not business records because they were created for the purposes of litigation. (6 RR 127) Appellant's trial counsel informed the trial court that the reports were confusing, and that the State was only introducing them to get a third hearsay statement in front of the jury. (6 RR 127)

The trial court overruled Appellant's objections because Lach testified that the reports were made in the course of medical diagnosis or treatment. (6 RR 127-128) Therefore, this issue was properly preserved.

## ARGUMENT

"Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority." *Taylor v. State*, 268 S.W.3d 571, 578 (Tex.Crim.App. 2008); *citing* Tex. R. Evid. 802. Once the opponent of hearsay makes the proper objection, the burden shifts to the proponent of the evidence to establish an exception to the hearsay rule that would permit the admissibility of the evidence despite the fact that the evidence is hearsay. *Taylor* at 578-579; *citing Martinez v. State*, 178 S.W.3d 806, 815 (Tex.Crim.App. 2005) and *Cofield v. State*, 891 S.W.2d 952, 954 (Tex.Crim.App. 1994).

Here, although the SANE reports contained hearsay, the trial court concluded that the reports were admissible because the statements contained therein were made for purposes of medical diagnosis or treatment. (6 RR 127-128) Pursuant to Texas Rule of Evidence 803(4):

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> *     *     *
>
> (4) **Statements for Purposes of Medical Diagnosis or Treatment**. Statements made for purposes of medical diagnosis

- 23 -

or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

*Taylor* provides an in-depth analysis of the federal and Texas application of the hearsay exception found in Rule 803(4). According to the Court of Criminal Appeals,

> We agree with the Austin Court of Appeals that, consistent with the rationale for admitting statements made for purposes of medical diagnosis or treatment over a hearsay objection, it is appropriate to require the proponent of the evidence to show that the out-of-court declarant was aware that the statements were made for that purpose and that **"proper diagnosis or treatment depends on the veracity of such statements."**…Absent such awareness on the declarant's part, we cannot be sure that the self-interested motive to tell the truth, making such statements sufficiently trustworthy to overcome a hearsay objection, is present.

268 S.W.3d at 589 (emphasis added).

The Court recognized that "reclining on a therapist's or psychiatrist's couch" is not the same as sitting in the emergency room in the immediate aftermath of an injury or on a physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. 268 S.W.3d at 589. "This explains the almost universal tendency…to assay the record, not for evidence of such awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the Rule 803(4) exception applies." *Id.* (footnote citations omitted).

Further,

> In the therapist's office, however, this tacit presumption is far less compelling. It is not always so readily apparent (indeed, it may not always be *accurate*) in the mental-health context that truth-telling is vital. Not even an older, more mature child (maybe not even an adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity) always to tell a mental-health provider the truth in order to assure the efficacy of treatment. In this context we think it is incumbent upon the proponent of the hearsay exception to make the record reflect both 1) that truth-telling was a vital component of the particular course of therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was aware that this was the case. Otherwise, the justification for admitting the out-of-court statement over a valid hearsay objection is simply too tenuous.

268 S.W.3d at 590.

In footnote 95, the Court noted multiple cases in which Texas courts inferred that young children understood the need to be truthful when making statements to health care professionals. In footnote 70, the Court noted multiple cases in which Texas courts have held that out-of-court statements from child-victims were inadmissible under Rule 803(4) because there was no reason to believe that the child would (or even could) have appreciated that the purpose of the statement was to facilitate diagnosis or treatment.

In an unpublished opinion, the Amarillo Court of Appeals recently applied the *Taylor* rationale to SANE reports, reaffirming that the declarant must be made aware that a proper diagnosis or treatment depended on the veracity of the statements made

- 25 -

to the SANE. *Lopez v. State*, 2014 WL 1267249 at *1 (Tex.App.—Amarillo 2014, pdr ref'd). In *Lopez*, the court ruled that the statements in the SANE report were admissible because

> [t]he record…revealed that [the SANE] informed the child 1) that she works for the hospital and takes care of children, 2) that "its real important for him to tell me the truth about what's going on so I know how to take care of him," and 3) that if he said his ear hurt but his stomach actually hurt, she would not be able to take care of him correctly. According to the same witness, the child victim knew both that he was there for medical diagnosis and treatment and that she used what was told to her for medical diagnosis and treatment.

2014 WL 1267249 at *1.

Here, Lach provided no evidence that she informed the girls that their proper diagnosis or treatment depended on the veracity of their statements. Lach testified that (1) she explained to the girls who she was; (2) she explained the nature of the exam; (3) the girls had an understanding that they were there for medical diagnosis or treatment; and (4) that she would be writing down everything they said verbatim. (6 RR 124-125) She did not, however, provide any testimony indicating that she informed the girls how important it was for them to tell the truth. Contrast this to Melanie Hughes' testimony that Texas law requires children to take an oath to tell the truth during forensic interviews. (6 RR 195) The CAC interviews clearly show Hughes explaining the difference between the truth and a lie to both "Barbara" and "Tasha" in a "kid-friendly" environment. The State routinely gets people like Hughes

qualified as experts in the field of forensic examination because these individuals are allegedly trained to make children so comfortable that they will tell the truth when they might not under other circumstances. Yet here the girls told extremely different stories to Hughes and Lach. Hughes' interviews were recorded; Lach's were not. Lach's examination was, according to her, conducted in a "kid-friendly" environment some eighteen days after the alleged abuse, and fourteen days after the girls' interviews with Hughes. (6 RR 162, 139) Hughes' interviews were conducted the day after the alleged outcries.

As noted in *Taylor*, the CAC's kid-friendly environment is not the same as sitting in the emergency room in the immediate aftermath of an injury, or on a physician's cold examination table in the interest of diagnosing and curing some exigent disease or ailment. 268 S.W.3d at 589. Therefore, the tacit presumption that the girls would be aware that Lach's questions were designed to elicit accurate information, and that their veracity would serve their best interests, is far less compelling.

Because the State provided no evidence that truth-telling was a vital component of the SANE reports, the State failed to carry its burden of proving the admissibility of the SANE reports over Appellant's hearsay objection. The trial court's erroneous admission of the SANE reports falls outside of the zone of reasonable disagreement,

and the ruling was not correct on any theory of law applicable to this case. As a result, the trial court abused its discretion.

## Harm Analysis

Texas Rule of Appellate Procedure 44.2(b) provides "that an appellate court must disregard a nonconstitutional error that does not affect a criminal defendant's 'substantial rights.'" *Jackson* at 887. A defendant's substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Id.*; *citing King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). "A criminal conviction will not be reversed for nonconstitutional error if the appellate court, after examining the record as a whole, 'has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Jackson* at 887-888 (citations and footnote omitted).

In voir dire, the State made specific reference to the "one witness rule." (5 RR 41-43) The State wanted the jury to understand that Appellant could be convicted based solely on the testimony of the alleged victims without the State providing any other evidence in support of the victims' claims. So, what was the purpose of calling Lach as a witness?

"Barbara" and "Tasha" were taken to the hospital for treatment immediately after their outcries. Yet the State did not subpoena any hospital employees as trial witnesses. Fourteen days after their hospital visit, and at the request of law

enforcement, Lach examined the girls at the CAC office with a colposcope. (6 RR 147) Lach used this highly invasive tool on these young girls even though she testified that any trauma would have most likely healed itself after eighteen days. (6 RR 141) Had Lach not used the colposcope, it would have very been difficult for the State to claim that Lach's SANE reports were taken for purpose of medical diagnosis or treatment.

More time was devoted to Kathy Lach than any other witness in this case, including the alleged victims. Through Lach, the State was able to spend a significant amount of time informing the jury as to why "Barbara" and "Tasha" would have no physical trauma, as well as explaining, in highly prejudicial detail and in words these girls wouldn't even understand, specifics of alleged sexual abuse that was never mentioned in the girls' CAC interviews. The State was permitted to have an "expert" witness simply regurgitate what "Barbara" and "Tasha" allegedly told Lach, in Lach's own words, without fear of Appellant pointing out the multiple inconsistences between Lach's report and the girls' initial statements made "under oath." The State had no fear of Appellant pointing out the inconsistencies because the State, from the very beginning of this trial, threatened to call multiple extraneous offense witnesses if Appellant even thought about cross-examining "Barbara" and "Tasha." (6 RR 9) This was extremely harmful and prejudicial to Appellant's constitutional right to present a defense.

It likewise cannot be said that Lach's testimony did not influence the jury or had but a slight effect. Lach was able to explain why the girls would have no injuries, then follow-up with informing the jury that "Barbara" and "Tasha" allegedly told Lach about abuse that virtually mimicked the language used in the Indictments. This was not what Rule 803(4) was designed to accomplish and the erroneous admission of Lach's SANE reports demands a reversal of Appellant's convictions.

## ISSUE II

The State's direct examination of forensic interviewer Melanie Hughes opened the door to cross-examination regarding the inconsistencies in the girls' claims of abuse without fear of the State offering extraneous offense evidence in rebuttal.

## STANDARD OF REVIEW

Whether or not a party "opens the door" to the introduction of otherwise inadmissible evidence is reviewed for an abuse of discretion. *Green v. State*, 934 S.W.2d 92, 101-2 (Tex.Crim.App. 1996). "If the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." *Id.* A trial court's ruling will be upheld as long as it falls within the "zone of reasonable disagreement." *Page*, 213 S.W.3d at 337; *citing Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1991)(op. on reh'g).

## PRESERVATION OF ERROR

After the State concluded its direct examination of forensic examiner Hughes, Appellant's trial counsel requested a hearing outside of the jury's presence and informed the trial court that the State's line of questioning put the veracity of the girls' statements at issue. (6 RR 205-206) Appellant's trial counsel argued that he was now free to address the inconsistencies in the girls' statements without fear of the State attacking Appellant with extraneous offense evidence. (6 RR 207) The trial court held that Hughes' testimony did not open any doors and denied Appellant's motion. (6 RR 212) Therefore, this issue was properly preserved.

## ARGUMENT

Evidentiary doors may be opened in a variety of ways. A defense attorney's opening statement may open the door to extraneous offense evidence to rebut defensive theories presented therein. *See, e.g., De La Paz v. State*, 279 S.W.3d 336 (Tex.Crim.App. 2009) and *Bass v. State*, 270 S.W.3d 557 (Tex.Crim.App. 2008). If a defense attorney claims that an alleged sexual assault victim has fabricated a story against his client, the State may put on evidence that his client sexually assaulted other girls in the same manner. *Bass* at 558.

Appellant's trial counsel sought a ruling that utilized this same rationale, but in reverse: Because the State elicited testimony from Hughes that put the girls' veracity

at issue, the State opened the door to cross-examining the girls regarding the consistency of their allegations. Appellant's trial counsel was correct.

According to Hughes, it is the law in Texas that children take an oath during their forensic interviews. (6 RR 195) Hughes testified in detail as to why children have a hard time testifying and remembering things, and that it is very common for children to have inconsistent stories. (6 RR 198-199) Hughes compares police reports to her interviews and looks for "consistency" in core details. (6 RR 201) In this case, Hughes saw no signs of coaching, and "Barbara" and "Tasha" "**appear[ed] to be testifying to something that they did, in fact, actually experience**." (6 RR 203) This was a direct opinion on the truthfulness of the girls' allegations, which is inadmissible in Texas courts. *See, e.g., Cantu v. State*, 366 S.W.3d 771, 777 (Tex.App.—Amarillo 2012).

Accordingly, Appellant's trial counsel claimed that Hughes' testimony opened the door to cross-examination of the girls regarding the consistency of their stories. In response, the State argued, in part, that:

> We have – now, I mean, frankly I think that we are free to ask [Hughes] what we want to ask. If he comes back and tries to pursue that, then that's a defense he is seeking. That's what he is putting out there. But to say that he gets to hammer these kids, and we don't get to bring in the extraneous is not how it works…
>
> …In this case, we have multiple extraneous offense victims, and the State is, as you can tell from Ms. Crisp's comments

throughout the course of this trial, is seeking to get that information introduced at trial…

(6 RR 208-209) The State went on to cite *Cantu* for the proposition that expert testimony regarding coaching is appropriate, but, the State claimed, Hughes was never asked if the girls were telling the truth. (6 RR 209)

The State specifically asked Hughes if the girls "…did in fact appear to be testifying to something that they did, in fact, actually experience," to which Hughes responded, "Yes, ma'am." (6 RR 203) How could this not be a comment on the veracity of the girls' statements? Hughes testified that it is very common for children's stories to be inconsistent, yet she looks for "consistencies" between a child's interview and police reports. (6 RR 198-201)

Although Appellant's trial counsel could have objected to Hughes' testimony, Appellant's trial counsel allowed Hughes to testify and simply asked for a ruling that Hughes placed the veracity, or the consistency, of the girls' statements at issue so he could effectively cross-examine the girls and defend Appellant against the State's theories that (1) there was consistency between the girls' interviews and the other reports, and (2) that the girls did in fact appear to be testifying about something they actually experienced.

The trial court's ruling not only permitted the bolstering of the girls' testimony, but the ruling also made certain that Appellant would not challenge Hughes'

testimony even though the State was in possession of evidence that significantly undermined Hughes' expert opinion. This was an abuse of the trial court's discretion.

**Harm Analysis**

The girls' CAC interviews are clearly inconsistent with (1) the SANE reports, (2) the outcry witnesses, and (3) the girls' trial testimony. In her CAC interview, "Tasha" only claimed Appellant touched her private part while they were driving in a car. "Tasha" said that her clothes were on and her "Paw Paw" was in the front of the car talking with Appellant as Appellant reached back and touched her private part. The only other time Appellant touched her private part was when they were riding on a motorcycle, and Appellant somehow had one hand on her private part and his other hand in his lap. "Tasha" told Hughes that she had never seen photos or videos of naked people. *See* Record Exhibit 2.

During trial, after a series of leading questions, "Tasha" testified that (1) she saw Appellant's privacy when he sexually abused her; (2) Appellant touched his privacy to her privacy; (3) Appellant put his privacy in her mouth; (4) Appellant put his privacy in her rear end; (5) she saw Appellant sexually abuse "Barbara;" and (6) Appellant showed her videos of people hunching. (6 RR 225-229) Contrary to Hughes' testimony, the "core details" of "Tasha's" CAC interview and her trial testimony were very inconsistent.

According to "Barbara's" CAC interview, she was in the living room when Appellant's man part touched her lips. When Hughes asked "Barbara" to tell her more, "Barbara" pointed to a drawing and said "his knees." "Barbara" said Appellant's man part went inside her lips and tasted like milk and felt like gum. "Barbara" drew what a man part looked like, then said Appellant put his man part in her middle part. "Barbara" said that she and Appellant were in Appellant's room because Gloria, Bobby and Appellant were fighting after Gloria and Bobby witnessed the alleged sexual abuse.

"Barbara" said Appellant flipped her over in the bed and put his man part in her middle part. At first, "Barbara" said they were both clothed, but then she said Appellant took her clothes off and put them back on. "Barbara" said she then went to the doctor because her butt was bleeding after Appellant whooped her with a belt. She said Appellant's man part felt soft, then changed the subject and said it was cold in the room. "Barbara" then said her clothes were on when Appellant's man part went in her middle part, and this only happened one time. Like "Tasha," "Barbara" said that no one had ever shown her videos of people without clothes on.

"Barbara" said that nothing came out of Appellant's man part when it went in her middle part. However, chocolate milk came out of Appellant's man part when it touched her lips, and the milk went in her mouth. It tasted like "white." She spit it in a towel and put the towel in the kitchen. "Barbara" also said that blood came out of

her middle part and went in her butt. "Barbara" claimed Appellant laid on her when she was on her stomach and fell asleep on her at some point. This made her feel hungry, and "Barbara" said she reached out and felt some Lucky Charms cereal when Appellant was laying on top of her. *See* Record Exhibit 2.

During trial, however, "Barbara" testified that Appellant put his hand on her private part, and "I think that's all." (6 RR 256) She didn't know if Appellant's middle part touched her middle part, but she answered "yes" when asked if Appellant's middle part went in her middle part. (6 RR 256) "Barbara" testified that Appellant's middle part went in her buttocks, and, while this was going on, she saw nasty movies with people hunching on television. (6 RR 257-259) Appellant had his underwear on when he put his penis in her mouth on Easter weekend. (6 RR 262) Milk came out of Appellant's middle part and it went in her mouth. "Barbara" said it tasted like plain milk. (6 RR 263-264) Contrary to her CAC interview, "Barbara" testified that she was bleeding between her legs because Appellant sexually abused her. (6 RR 265) Contrary to "Tasha's" CAC interview, "Barbara" testified that Appellant never touched her between her legs in the car. (6 RR 266) Appellant told them they were his girlfriends as he abused them, and Appellant asked "Barbara" if she liked the abuse and then spanked her when she said no. (6 RR 268, 278)

There are many inconsistencies between the girls' CAC interviews and the girls' trial testimony. Even though Hughes testified that she looked for consistencies

in the girls' interviews and the police reports, and that the girls' appeared to be talking about something they did, in fact, actually experience, the trial court would not give Appellant the benefit of cross-examining Hughes without fear of being attacked by extraneous offense evidence the State was itching to introduce. This violated Appellant's constitutional right to present a meaningful defense.

"Erroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional right to present a meaningful defense." *Potier v. State,* 68 S.W.3d 657, 663 (Tex.Crim.App. 2002). There are two ways such error might violate a defendant's constitutional rights: (1) by following a state evidentiary rule that categorically and arbitrarily stops the defendant from offering relevant, reliable evidence vital to his defense, or (2) by a trial court's clearly erroneous ruling excluding relevant, reliable evidence that "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Wiley v. State,* 74 S.W.3d 399, 405 (Tex.Crim.App. 2002) *citing Potier,* 68 S.W.3d at 665.

Here, the trial court's ruling excluded relevant, reliable evidence that formed a vital portion of Appellant's case. There was no physical evidence introduced during Appellant's trial. The only evidence indicating Appellant sexually abused anyone came from the stories told by the alleged victims. Yet Appellant was unable to inform the jury as to the many, many inconsistencies in the girls' stories without fear that the State would march multiple witnesses into the courtroom to testify that Appellant

abused them at some point in the past. From the outset of the trial, the State informed Appellant that they would attempt to introduce extraneous offense evidence if Appellant cross-examined the girls on the details of their stories. (6 RR 9) This is not how the evidentiary rules were designed to be utilized. The State should not have been permitted to knowingly put on inconsistent testimony, then use the threat of extraneous offense evidence should the known inconsistencies be brought to light in front of the jury. Appellant's fundamental constitutional rights were violated, which demands a reversal of Appellant's convictions.

## ISSUE III

After the "Rule" was invoked, the trial court erred by permitting Child Advocacy Clinical Director Karrah Dickeson to remain in the courtroom while the alleged victims testified.

## STANDARD OF REVIEW

A trial court's decision to permit a witness to remain in the courtroom after the "Rule" is invoked is reviewed for an abuse of discretion. *Moore v. State*, 882 S.W.2d 844, 848 (Tex.Crim.App. 1994).

## PRESERVATION OF ERROR

Prior to "Tasha" taking the stand, the State requested that Dickeson remain in the courtroom while "Tasha" and "Barbara" testified because Dickeson was going to be an expert witness and Dickeson needed to observe the girls' testimony. (6 RR 220-221) Appellant's trial counsel objected "until [he knew] the basis of why she needs to

observe the testimony."  (6 RR 221)  Without requiring anything further from the State, the trial court overruled Appellant's objection.  (6 RR 221)  Therefore, this issue was properly preserved.

## ARGUMENT

The State invoked the "Rule" prior to opening statements.  (6 RR 63)  The "Rule" is found in Texas Rule of Evidence 614, which provides as follows:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of:
>
> **(1)** a party who is a natural person or in civil cases the spouse of such natural person;
>
> **(2)** an officer or employee of a party in a civil case or a defendant in a criminal case that is not a natural person designated as its representative by its attorney;
>
> **(3)** a person whose presence is shown by a party to be essential to the presentation of the party's cause; or
>
> **(4)** the victim in a criminal case, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial.

A party seeking an exception under Rule 614 has the burden of showing that one of the enumerated sections is met.  *Moore* at 848.  Here, no such showing was made.  The State simply informed the trial court that Dickeson was going to be an expert witness and she needed to observe the girls' testimony.  Even though

- 39 -

Appellant's trial counsel requested that the State provide a more detailed basis, which is expressly required by Rule 614(3), the trial court required nothing further from the State and overruled Appellant's objection. As a result, the trial court abused its discretion. *See Moore* at 848.

**Harm Analysis**

The trial court's error will not require reversal if this Court determines that the error was harmless beyond a reasonable doubt. *Moore* at 848.

In front of the jury, the State asked Dickeson if she had the benefit of seeing the girls testify, to which she responded, "Yes, ma'am, I did." (7 RR 16) Dickeson then testified that the girls did not know words like "sexual abuse" until they started receiving treatment. (7 RR 17) Compare this to Conesha's outcry testimony where Conesha said "Barbara" told her that Appellant had been "molesting her." (6 RR 101)

Dickeson stated that knowing words like "sexual abuse" helps the girls understand "what it is that they have experienced." (7 RR 17) This was another direct opinion on the truthfulness of the girls' allegations, which drew an objection from Appellant's trial counsel. The State responded, "I mean, the expert was in the courtroom and has explained to the jury why a five-year-old could use the term sexual abuse." (7 RR 17)

It appears as though Dickeson's testimony was offered to clear up any confusion the jury may have had with the girls using terms like "sexual abuse" during

their testimony. The State also used Dickeson to help explain why "Tasha" had difficulty testifying as to the graphic details of sexual abuse. (7 RR 21-22) In a round about way, the State was able to make double-certain that the jury did not think the girls' testimony was coached or inconsistent. Appellant was undoubtedly harmed when the jury heard yet another witness testify that, in her expert opinion, the girls had been abused. Therefore, the trial court's error was not harmless beyond a reasonable doubt.

## ISSUE IV

During final closing argument, the State's instruction for the jury to "[g]o back there and fight for those little girls" was an improper plea for abandonment of objectivity, and the trial court erred by overruling Appellant's objection to the same.

## STANDARD OF REVIEW

According to *Harris v. State*:

> The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial in order to arrive at a just and reasonable conclusion based solely on the evidence. *Barnes v. State,* 70 S.W.3d 294, 308 (Tex.App.-Fort Worth 2002, pet. ref'd). To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State,* 848 S.W.2d 85, 94–95 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 95, 126 L.Ed.2d 62 (1993); *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Crim.App.1973). If a jury argument exceeds the bounds of proper argument, the trial court's erroneous overruling of a defendant's objection cannot be reversible error unless, in light of the record as a whole, the argument had a substantial and injurious

- 41 -

effect or influence on the jury's verdict. TEX.R.APP. P. 44.2(b); *Martinez v. State,* 17 S.W.3d 677, 692–93 (Tex.Crim.App.2000); *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

122 S.W.3d 871, 883-884 (Tex.App.—Fort Worth 2003, pdr ref'd)

## PRESERVATION OF ERROR

Appellant's trial counsel immediately objected when the State instructed the jury to "go back there and fight for those little girls." (7 RR 63-64) The trial court overruled the objection. (7 RR 64) As a result, this issue was properly preserved.

## ARGUMENT

The State's instruction for the jury to "go back there and fight for those little girls" does not fit into any of the four categories outlined above. Rather, the State's demand was a "plea for abandonment of objectivity." *See, e.g., Brandley v. State*, 691 S.W.2d 699, 713 (Tex.Crim.App. 1985). The jury is not supposed to fight for either side. The jury is chosen based on their ability to view the evidence objectively and reach a true verdict. The State's instruction for the jury to fight for "Barbara" and "Tasha" removed any objectivity from their deliberations and was highly impermissible.

## Harm Analysis

The State's impermissible argument came at the very end of the trial, at a point where Appellant had no chance of responding. After the trial court overruled

- 42 -

Appellant's objection, the jury was left with the false impression that it was their duty to go back to the jury room and fight for "Barbara" and "Tasha". In light of the record as a whole, and considering the multiple points of error raised herein, this argument had a substantial and injurious effect or influence on the jury's verdict. Therefore, this error also demands a reversal of Appellant's convictions.

## **PRAYER**

For the reasons set forth above, Appellant prays that this Court reverse the judgment of the trial court and render a judgment of acquittal. In the alternative, Appellant prays that the cause be remanded for a new trial, and for any other and further relief that this Court deems Appellant justly entitled.

Respectfully submitted,

JASON HORTON LAW FIRM
114 West Broad Street
Texarkana, Texas 75501
*Mail To:*
Post Office Box 1596
Texarkana, Texas 75504
T-903-792-2000
F-903-792-2100
www.jasonhortonlaw.com

BY: /s/ Jason Horton
Jason Horton
jason@jasonhortonlaw.com
Texas Bar No. 24041130

ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I certify that this document was prepared with Microsoft Word, and that, according to that program's word-count function, the sections covered by Tex. R. App. P. 9.4(i) contains 8,537 words.

/s/ Jason Horton
Jason Horton

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing has been forwarded to the following listed persons this 23rd day of January, 2015:

Mr. Jerry Rochelle
Bowie County District Attorney
Bowie County Plaza
601 Main Street
Texarkana, Texas 75501

/s/ Jason Horton
Jason Horton